# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| LAWRENCE HANDORF, BOAGF HOLDCO LP, and PHT HOLDING II LP, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>        Defendant. | Case No. 1:23-cv-00032-CJW-MAR<br><br><br>FIRST AMENDED COMPLAINT |

## FIRST AMENDED COMPLAINT

Pursuant to FRCP 15(a)(2) and with the written consent of the Defendant, Plaintiffs Lawrence Handorf, BOAGF Holdco LP, and PHT Holding II LP, by and through the undersigned attorneys, file this First Amended Complaint by this Court's December 1, 2023 deadline for amending the pleadings and adding parties (Dkt. 94) and bring this action on behalf of themselves and all others similarly situated against Defendant Transamerica Life Insurance Company ("Transamerica").

## NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiffs and similarly situated owners of Transamerica universal life insurance policies. Plaintiffs seek to represent a class of Transamerica policyholders who have been subjected to an unlawful and excessive monthly deduction rate ("MDR") and cost of insurance ("COI") rate increase.

2. The policies at issue in this case are primarily flexible premium universal life policies issued, insured, or assumed by Transamerica that were subjected to an increase in MDR or COI rates announced in 2021 (collectively, the "Policies").

3. The principal benefit of universal life policies generally, and the Policies specifically, is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premium payments required for universal life policies are flexible and need only be sufficient to cover the MDR/COI charges and certain other specified expenses. The MDR/COI charge is typically the highest charge that a policyholder pays.

4. Any premiums paid in excess of MDR/COI charges and expense components are applied to the policy's "accumulation account," sometimes known as "policy account" or "cash value." These excess premiums earn interest, often called the "credited rate."

5. The Transamerica policies explain how these MDR/COI charges are calculated using "Monthly Deduction Rates" or "Cost of Insurance rates." The terms "monthly deduction rate" and "cost of insurance" are functionally synonymous, with some Policies using the former term and others using the latter term. Accordingly, the term "Monthly Deduction Rate" and the abbreviation "MDR," as used in this Complaint, refers to both monthly deduction rates and COI rates; the term "MDR charge" refers to both MDR charges and COI charges; and the terms "MDR hike" or "MDR Increase" refer to the increase in both MDR and COI rates that Transamerica announced in 2021. Neither Transamerica nor its actuarial consultant that assisted with the 2021 MDR Increase drew any functional distinction between MDR and COI rates.

6. Because the MDR charges are the main driver of how much money needs to be paid into these policies, the policy terms explaining how and when the MDR can be adjusted are some of the most important terms of the contract.

7. For example, Plaintiff BOAGF Holdco LP's ("BOAGF") Policy, includes the following terms for adjusting MDRs:

> Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes. . . . This is nonparticipating insurance. . . . We do not distribute past surplus or recover past losses by changing the monthly deduction rates.

8. The four policies owned by Plaintiffs Lawrence Handorf and PHT Holding II LP are also nonparticipating universal life policies but use the term "Cost of Insurance Rate" rather than "Monthly Deduction Rates." Three of those policies contain the following requirements: "The Monthly Cost of Insurance Rate is based on the Insured's: Sex, Attained age, and Premium class shown on page 3. . . . Any change in Cost of Insurance Rates will be applied uniformly to all members of the same premium class." The language of the fourth policy differs only inasmuch as "Sex" is not listed as a factor on which COI rates will be based: "The Cost of Insurance Rate is Based on the insured's: Attained age, and Premium class shown on page 3. Any change in Cost of Insurance Rates will be applied uniformly to all members of the same premium class."

9. Beginning in late 2021, after Plaintiffs' policies had been in force for roughly 15 years or more, Transamerica announced a large MDR increase set to take effect in 2022. BOAGF, Handorf, and PHT II were notified that their MDRs were set to increase, with some of the Policies increasing by as much as 74%. Transamerica stated that this MDR increase was "in addition to the customary increases that are associated with age" and attributed them to Transamerica's "current expectations about our future costs for providing this coverage." Transamerica provided no further explanation for the increase, which resulted in Plaintiffs experiencing a massive increase in premiums required to maintain their policies in force.

10. As a direct result of Transamerica's actions, Class Members are faced with the imminent harm of either paying the exorbitant and unjustified new charges, or losing the benefits for which they have dutifully paid premiums for many years. Mr. Handorf surrendered his policy after incurring multiple overcharges.

11. The MDR increase violates the Policies in numerous respects. *First*, the main driver of MDRs are the insurer's mortality expectations. To justify such a massive rate hike, Transamerica must claim that it has experienced a recent, massive deterioration in its mortality expectations. But both industry experience and Transamerica's own statements belie any such claim: mortality experience has materially improved industry-wide at a rate of roughly 1 percent per year since the Policies were issued, and Transamerica itself has acknowledged in recent years

that its mortality expectations have continued to improve. There is no ground for the massive MDR hikes imposed by Transamerica given improved mortality expectations.

12.     ***Second***, no "future cost factors," including those delineated in the Policies – expenses, interest, persistency, or taxes – have changed materially for the worse, or to any extent that could justify such a massive MDR hike, especially in light of the improved mortality expectations. Transamerica has not had any increased costs due to expenses, interest, persistency, taxes, or any other future cost factor that could lead to this massive increase – nor has it identified any in its statements to policyholders or elsewhere. The Society of Actuaries ("SOA") periodically publishes studies of industry expenses for administrating policies. Those studies show slow rates of expense increases for this minor element of the MDR that would be immaterial to the MDR for a 75-year-old. Similarly, the SOA periodically publish studies of persistency which show immaterial changes in policyholder behavior over the last decade, while corporation tax rates have if anything been reduced. For example, the Tax Cuts and Jobs Act of 2017 reduced the headline corporation tax rate from 35% to 21% starting January 1, 2018.

13.     Transamerica's imposition of the MDR increase in the face of improving mortality also violates the promises in the Handorf and PHT II Policies that "Cost of Insurance rate is based on" each insured's attained age, premium class, and/or sex. Age, premium class, and sex are all well-known mortality factors, and Transamerica's internal expectations of future mortality experience are broken down by attained age, premium class, and sex. Transamerica breached this provision by, for example, increasing COI rates based on factors wholly unrelated to age, premium class, and sex and failing to even analyze the extent to which its mortality expectations had improved.

14.     ***Third***, Transamerica's massive MDR increase on the Policies recoups past losses, in breach of the contractual terms stating that the Policies are "nonparticipating" and that any change in the MDRs will not recover "past losses" and "will be prospective." Insurance is intended to cover policyholders for unforeseen future events, with the insurance company taking the risk of the unknown (whereas events in the past are known). These terms are meant to prevent the insurer

from engaging in a bait-and-switch tactic, where it projects future premiums using an original scale of MDRs, collects premiums, and then, with customers locked in, turns around many years later and reveals more expensive MDRs due to alleged changes in expectations that happened long ago. Transamerica's mortality expectations have continued to improve, and any mismatch between its pricing assumptions and its current assumptions would have been known and recognized by Transamerica many years ago. As a result, to the extent the MDR increase offsets alleged losses, those losses were recognized many years ago, and the MDR increase was designed to and did recoup past losses in violation of the Policies.

15.     *Fourth*, Transamerica's MDR increase on the Policies was not uniform. Contractual terms state that any change in the MDRs "will be applied uniformly to all members of the same premium class." The purpose of this provision is to maintain equity between Transamerica's universal life policyholders and prevent groups of insureds from being discriminated against. The MDR hikes were not uniform because Transamerica applied increases to some policies within each premium class but not others. For example, at the time of the MDR hike, Transamerica was administering thousands—maybe more—policies assigned to the same premium class (*e.g.*, "Standard," or "Non-Smoker") as Plaintiffs' policies. Indeed, Transamerica even targeted one tiny group of 26 policies with a 151% MDR increase despite those policies having the exact same premium classes—and, according to Transamerica, the same pricing assumptions—as thousands of other policies that received no MDR increase at all. Because only a subset of policies with the same premium class were hit with the MDR increase, the MDR increase was not uniform across each premium class.

16.     The MDR increase and Transamerica's actions preceding it therefore breached the Transamerica policies by (a) not determining MDRs based on its expectations as to future cost factors as required by the Policies, (b) charging MDRs that were not "based on" enumerated factors in the Policies, (c) imposing a massive increase in MDRs to recoup past losses at the expense of the Policyholders, and (d) imposing an MDR increase that was not applied uniformly to all members of the same premium class.

## THE PARTIES

17. Plaintiff Lawrence Handorf ("Handorf") is a resident of Ohio. Handorf was the owner of a Lifetime Protector II life insurance policy (Policy No. 012930352), issued by Life Investors Insurance Company of America in Iowa on or about December 1, 2003, with a face amount of $100,000 (the "Handorf Policy").

18. Plaintiff BOAGF Holdco LP ("BOAGF"), is a Delaware limited partnership, whose 99% partner is BlackOak Alpha Growth Fund in Cayman. BOAGF is the owner of a TransUltra 115 universal life insurance policy (Policy No. 00060019286), issued by Transamerica Occidental in California on or about December 11, 1997, with a face amount of $1,200,000 (the "BOAGF Policy").

19. Plaintiff PHT Holding II LP ("PHT II") is a Texas limited partnership. PHT II owns three life insurance policies: (1) an Ultimate Protector life insurance policy (Policy No. 012168036) issued by Life Investors Insurance Company of America on or about April 1, 2007 with a face amount of $150,000 (the "PHT II Roberts Policy"); (2) a Lifetime Protector II life insurance policy (Policy No. 013384333) issued by Life Investors Insurance Company of America on or about November 1, 2007 with a face amount of $250,000 (the "PHT II Jackson Policy"); and (3) a Uni-VIP life insurance policy (Policy No. 011020535) issued by Life Investors Insurance Company of America on or about March 1, 1985 with a face amount of $10,000 (the "PHT II King Policy" and collectively the "PHT II Policies").

20. Defendant Transamerica is a corporation organized under Iowa law, with its principal place of business located at 6400 C Street SW, Cedar Rapids, Iowa, 52499. Transamerica is a citizen of Iowa.

21. Transamerica Occidental Life Insurance Company ("Transamerica Occidental"), which issued the BOAGF Policy, was a corporation organized under California law, with headquarters at 1150 S. Olive Street, Los Angeles, California, 90015 and its principal place of business located in California.

22. On or about October 1, 2008, Transamerica Occidental was merged into Transamerica, making Transamerica its successor-in-interest.

23. Life Investors Insurance Company of America, which issued the Handorf Policy and the PHT II Policies, was a corporation organized under Iowa law, with its headquarters at 4333 Edgewood Road NE, Cedar Rapids, Iowa 52499 and its principal place of business located in Iowa.

24. On or about October 2, 2008, Life Investors Insurance Company of America merged into Transamerica, making Transamerica its successor-in-interest. Transamerica Occidental, Life Investors Insurance Company of America, and Transamerica Life Insurance Company are collectively referred to as "Transamerica."

**JURISDICTION AND VENUE**

25. This Court has jurisdiction over the parties to this action. Jurisdiction and venue are both proper in this Court because the Central District of California found that transfer to the Northern District of Iowa was appropriate under 28 U.S.C. § 1404(a). Dkt. 60; *see also* Dkts. 31, 57.

26. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the Complaint alleges claims on behalf of a national class of policyholders who are minimally diverse from Transamerica, as there are individuals who are members of the putative class that are citizens of a state other than Iowa, and because the aggregate of these claims exceeds $5,000,000.

**FACTUAL BACKGROUND**

A. **The Transamerica Policies at Issue**

27. The Policies are flexible premium universal life policies issued by Transamerica (including its predecessors) in the late 1990s and early 2000s. The class on whose behalf this action is being brought consists of all owners of universal life insurance policies, insured or assumed by Transamerica that have been, or will be, subjected to the MDR increase that Transamerica began announcing in 2021. On information and belief, this 2021 COI increase does not include any of the Policies whose claims about MDR increases imposed by Transamerica in 2017 and 2018 were

resolved by the settlement in *Thompson et al. v. Transamerica Life Insurance Co.*, Case No. 2:18-cv-05422 (C.D. Cal.),[1] nor does it include any of the Policies whose claims about MDR increases imposed by Transamerica in 2015 and 2016 were resolved by the settlement in *Feller et al. v. Transamerica Life Insurance Co.*, Case No. 2:16-cv-01378 (C.D. Cal.).[2]

28. Traditionally, life insurance companies sold two types of policies: term and whole life insurance. Term life insurance is for a term of years, normally building up no cash value and expiring without value. Whole life insurance provides coverage for life and provides an increasing cash value that is available when needed. The premiums remain level throughout the life of the policy.

29. Universal life insurance provides more flexibility than whole or term life insurance. There are no fixed or minimum premium payments required by the policies. The principal benefit of universal life policies is that they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for universal life policies need only be sufficient to cover the MDR charges and certain other specified expenses. The MDR charge is typically the highest expense that a policyholder pays.

30. Universal life policies are designed to be permanent policies, which are held until the death of the insured. As Transamerica explains on its website, "[U]niversal life insurance is a type of permanent life insurance that provides coverage for life, as long as premiums are paid."

31. Under the provisions of the Policies, an "accumulation account" is established for each policy, into which the Policyholder's premium payments are deposited. Transamerica's Policies use the term "Monthly Deductions" to refer to the MDR charge. At the end of each policy

---

[1] The Settlement Class involved the following types of life insurance policies subjected to MDR increases imposed in 2017 and 2018: TransSurvivor 115 97/98/99 and TransUltra 115 98/99.

[2] The Settlement Class involved the following types of life insurance policies issued between 1983 and 2008 subjected to MDR increases imposed in 2015 and 2016: Assured Life, Assured Life T7, Preferred Policyowners Life, Transcender, TransLife, TransMax, TransMax Survivor 90, TransMax Survivor 91, TransSurvivor Life 92, TransSurvivor Life 95, TransSurvivor Life 96, TransUltra 91, TransUltra 93, TransUltra 95, TransUltra 96, TransUltra EX, TransUltra XL, TransUltra SP, TSSL, TSSL 2000, TSSL EX, TSSL XL.

month, Transamerica withdraws a Monthly Deduction (*i.e.*, MDR charge) from the Policy's accumulation account.

32. Any premiums paid in excess of MDR charges and expense components earn interest in the accumulation account at the declared interest rate not less than the guaranteed minimum interest rate specified in the policy. The BOAGF Policy, for example, provides for guaranteed interest at the rate of 4%. Other policies contain similar interest rate guarantees.

33. The structure of universal life policies is beneficial because it allows policyholders to minimize their capital investment and generate greater rates of return through other investments. Depending on the interest rate environment and the credited rate, other policyholders may choose to heavily fund their policies and use the interest to pay MDR charges and grow the accumulation value.

34. The size of the MDR charge is highly significant to Plaintiffs and all universal life Policyholders for at least two important reasons. First, it informs the minimum amount of money they must pay to keep a policy in force. Second, high MDRs can quickly diminish a policy's accumulation value (*i.e.*, the savings component) and reduce the amount of money on which the policyholder can earn interest. Even small changes in the MDR can produce a dramatic increase in the dollar amount of the MDR charged by Transamerica, particularly for elderly insureds. The higher the MDR, the greater the premiums required to maintain a positive balance in the accumulation account. Absent a secondary guarantee, if a policy accumulation account value diminishes such that MDR charges can no longer be deducted, and the appropriate time expires after Transamerica provides an accurate and adequate grace notice, then a policy may lapse unless additional premiums are paid in.

35. The BOAGF Policy includes the following "Monthly Deduction" rate term:

> Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

36. The BOAGF Policy also contains an additional non-recoupment term limiting Transamerica's ability to increase the MDR: "This is nonparticipating insurance. . . . We do not distribute past surplus or recover past losses by changing the monthly deduction rates."

37. Notably, this limits Transamerica's ability to change the MDRs only where expected "future cost factors" associated with the cohort of in-force Policies are less favorable than Transamerica previously assumed for those same cost factors.

38. The Handorf Policy and the PHT II Policies are also "nonparticipating" policies that do not permit Transamerica to increase the MDR to recover past losses. The Handorf Policy and PHT II Policies contain an express uniformity provision, requiring that "Any change in the cost of insurance rates will be applied uniformly to all members of the same premium class." In other words, Transamerica cannot increase rates on one set of policies unless it can justify, and actually imposes, the same increase on all policies with the same premium class; it cannot pick and choose which members of a premium class on which to impose a rate increase.

39. The Handorf Policy, PHT II Roberts Policy, and PHT II Jackson Policy also require that "[t]he Monthly Cost of Insurance Rate is based on the Insured's: Sex, Attained age, and Premium class shown on page 3." The PHT II King Policy requires that "[t]he Monthly Cost of Insurance Rate is based on the Insured's: Attained age, and Premium class shown on page 3." This term requires Transamerica to base its MDRs on a limited set of factors, all of which are used to estimate an insured's mortality.

40. The Policies are all issued on standardized form policies, and insureds are not permitted to negotiate different terms. They are all contracts of adhesion.

**B.      Transamerica's Announcement of Unlawful MDR Hike**

41. Beginning in late 2021, Transamerica suddenly announced the unilateral MDR increase on the Policies.

42. Transamerica began to notify Policyholders of the MDR increase through a uniform form letter. In the letter, Transamerica purported to explain "What's Changing and Why." Transamerica claimed that it was increasing MDRs "based on our current expectations about our

future costs for providing this coverage" and that the increases are "in addition to the customary increases that are associated with age."

43. Transamerica thus acknowledged in part the limited grounds upon which the Policies permit an increase in the MDR and represented the increase was driven by those limited grounds. Transamerica did not give any other explanation for the increase in the MDR in the notice letter.

44. Transamerica began imposing the MDR increase on the Policies, resulting in a massive increase in the premiums necessary to maintain coverage.

45. Pursuant to the MDR increase, Transamerica has increased the amount taken from Plaintiffs' and Class Members' accumulation accounts upon their respective Policy's anniversary dates. For example, beginning February 28, 2022, the BOAGF Policy experienced an approximately 61% increase in its MDR. Beginning on July 1, 2022, the Handorf Policy experienced an approximately 74% increase in its MDR. The PHT II Policies experienced MDR increases of approximately 74%, 26%, and 18%, respectively. Plaintiffs and Class Members are now required to pay much higher MDRs to maintain the same level of coverage under their respective Policies.

**C.** **Transamerica's Unlawful MDR Hike**

46. The Polices do not authorize Transamerica to set or increase MDRs in whatever amount or by whatever method it determines.

47. Rather, the BOAGF Policy states that "any change" in the MDR "will be prospective and will be subject to our expectations as to future cost factors." By limiting MDR changes to being based only on expectations "as to future cost factors," the Policy forbids MDR increases that are based on a carrier's desire to increase profits or to recoup past losses. Further confirming this, the BOAGF Policy explicitly states that the policies are "nonparticipating insurance" and that Transamerica will not increase the MDR to "recover past losses." The Handorf and PHT II Policies are also nonparticipating policies.

48. Transamerica does not claim that the MDR increase is based on anything but "future cost factors," telling Policyholders only that it is increasing the MDRs based on "our current expectations about our future costs for providing this coverage." But no change to any of the enumerated "future cost factors" independently, nor when considering all of the enumerated factors together, could warrant the massive MDR increase. Not only did Transamerica ignore positive changes in enumerated factors – such as recent corporate tax reform that benefited Transamerica – but recent changes in mortality, expenses, interest, persistency, and taxes and other cost factors could not possibly warrant an increase, much less one of this massive size.

a. <u>**Transamerica's Expectations of Future Mortality Experience Have Improved**</u>

49. Mortality is by far the largest driver of MDRs and COI rates. Transamerica's expectations as to mortality could not have changed materially for the worse in recent years to warrant an increase in MDRs, much less a massive one. To the contrary, mortality expectations have improved since Transamerica issued the Policies. Because Transamerica's cost factors and mortality-related factors improved, or at a minimum did not significantly deteriorate, Transamerica had no justification for adjusting MDRs significantly *upward* consistent with its promises that changes in MDRs would be "subject to our expectations as to future cost factors" or that MDRs would be "based on" the mortality factors "attained age, sex, and premium class."

50. Insurers like Transamerica systematically quantify their mortality expectations on an annual or biennial basis. They perform experience studies which examine their historical mortality experience and, from that mortality experience, develop predictions of mortality they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status, and duration since

underwriting. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect the carrier's expectations of future mortality.

51. Beginning at least as early as 1941, the National Association of Insurance Commissioners ("NAIC") has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. The SOA has established a committee to develop an update of the CSO tables, which are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted COI rates in universal life policies. The SOA also published a report in October 2015 on the CSO table updated in 2015 (the "2015 VBT" or "2015 Valuation Basic Table") that showed significant reductions in insurance company reserves due to recent mortality improvements. In October 2022, the SOA published a report on older age mortality aimed for ages 70 upward. The report was part of the SOA process that helps determine whether refinements are needed in the 2015 Valuation Basic Table. The SOA used the most recent experience data available to it. The report did not find any need to make changes to the 2015 VBT.

52. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, the SOA and the American Academy of Actuaries ("Academy") produced a proposal for a new CSO mortality table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

53. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables show a substantial improvement in mortality over a 20-year period. These mortality improvements represent a substantial benefit that

Transamerica should have passed on to Policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

54. The SOA established a committee to develop an update of the CSO tables. A report on the updated CSO tables by the SOA was published in October 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

55. The 2001 CSO Mortality Table was generated from the 1990-1995 basic mortality tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares them to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975–1980 Basic Select and Ultimate Mortality Table
- 1985–1990 Basic Select and Ultimate Mortality Tables
- 1990–1995 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

56. The 1990–1995 Basic Table reflected the death rates observed by twenty-one large life insurance companies with policy anniversaries between 1990 and 1995. The 2001 Basic Mortality Table, 2008 Valuation Basic Table, and 2015 Valuation Basic Table each show significant mortality improvements from the 1990–1995 Basic Select and Ultimate Mortality Tables, demonstrating that, since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently. The report accompanying the 2015 Valuation Basic Table states: "The current CSO table was created in 2001 based on experience from 1990–1995 and thus, is at least 20 years old. Since that time, industry experience

studies performed by the Society of Actuaries Individual Life Experience Committee ('ILEC') have shown significant mortality improvement in the mortality experiences experienced by the industry from that underlying the 2001 CSO table development." Other surveys have also noted mortality improvements. In May 2013, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rate and mortality improvements at older ages, which showed material rates of mortality improvements. The report was based on a survey of insurance companies. In March 2014, the actuarial firm Milliman published a report sponsored by the SOA called "Select Period Mortality" showing select rates of mortality that are strongly improved over the 2001 Valuation Basic Mortality Table. Their report was based on a survey of insurance companies.

57. This trend of improving mortality expectations has continued to the present day in the industry. In 2017, the SOA published a study with recommendations for mortality improvement assumptions for insurance reserving for AG-38 (Actuarial Guideline No. 38), which covers reserving for certain universal life insurance policies. The SOA updates this study annually and these studies show improving mortality across the board for the last five years, with no negative figures in any published table from 2013 and 2017. And in 2019, the SOA issued a report finding that in 2018, the United States age-adjusted mortality rate realized its largest decrease since 2009, and the 2018 mortality rate is now the lowest mortality rate in U.S. history. These mortality improvements represent a substantial benefit that Transamerica should have passed on to Policyholders in the form of cheaper MDRs, but never did.

58. Industry insiders also report continuing and consistent mortality improvements. For example, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley), show increases in life expectancy and lowering of mortality rates between 2010 and 2015 for older-aged individuals in the United States. And a SOA report on historical population mortality rates shows continuing mortality improvements every five years between 2000 and 2014.

### b. Other Factors Do Not Warrant an Increase

59. Transamerica also implicitly suggests that the increase is based on changes in the other factors – its expectations as to future expenses, interest, persistency, and taxes – but it has not explained how. The massive increase could not be based on changes to any of these factors, especially in light of improving mortality expectations, which outweigh any of these and any other cost factors.

60. *First*, Transamerica's expectations as to future "expenses" could not have changed materially for the worse in recent years to warrant an MDR increase, much less a massive one. Such expenses have at most only a minor impact on the expected future profitability of the Policies. Transamerica is incurring no further sales or acquisition costs (such as agent commissions) in connection with the Policies. The administrative expenses associated with the Policies are stable and predictable. The large majority of expenses incurred by an insurance company for universal life insurance policies occur at the time the policy is sold, with the commitment to pay original commissions to sales teams. Transamerica cannot base its change on events that happened in the past (*i.e.*, the sale of the policy) without violating the contract's bar on recouping prior losses. Additionally, the allocated expense of maintaining insurance contracts is nominal and does not materially change from year to year, let alone in a way that could justify such a massive increase in MDRs. Moreover, the Policies already charge a separate "monthly expense charge" and "administrative fees" designed to cover certain expenses. Periodically the SOA publishes a Generally Recognized Expense Table ("GRET"). In August 2022, the SOA published its recommendations for 2023. As can be seen from the tables below, most of the expenses for a life insurance policy are "Acquisition" costs – *i.e.*, broker fees that are already incurred and prohibited from being recouped by the policy language. The maintenance costs are a tiny fraction of the MDR. For example, the direct marketing distribution channel annual maintenance cost of $59pa was only $13pa more expensive than the equivalent figure ($46 pa) in 1998 and does not justify increasing the Plaintiffs' MDR charges by tens of thousands of dollars.

**TABLE 1**

PROPOSED 2023 GRET FACTORS, BASED ON AVERAGE OF 2019/2020 DATA

| DESCRIPTION | Acquisition per Policy | Acquisition per Unit | Acquisition per Premium | Maintenance per Policy | Companies Included | Average Premium Per Policy Issued During Year | Average Face Amt (000) Per Policy Issued During Year |
|---|---|---|---|---|---|---|---|
| Independent | $180 | $1.00 | 45% | $54 | 141 | 3,073 | 204 |
| Career | 203 | 1.10 | 51% | 61 | 84 | 2,296 | 197 |
| Direct Marketing | 197 | 1.10 | 49% | 59 | 21 | 899 | 57 |
| Niche Marketing | 147 | 0.80 | 37% | 44 | 30 | 507 | 14 |
| Other* | 153 | 0.90 | 39% | 46 | 106 | 853 | 72 |
| * Includes companies that did not respond to this or prior year surveys | | | | | 382 | | |

| Expense Type | Expense Factor | GRET Year | Branch Office | Direct Marketing | Home Service | Career General Agency | Brokerage | PPGA | Multiline | Other Types |
|---|---|---|---|---|---|---|---|---|---|---|
| Maintenance | Per Policy | 1998 | $33 | $46 | $27 | NA | NA | NA | NA | $37 |
| | | 2001 | $35 | $43 | $30 | NA | NA | NA | NA | $39 |
| | | 2003 | $33 | $40 | $31 | NA | NA | NA | NA | $43 |
| | | 2006 | $38 | $56 | $36 | NA | NA | NA | NA | $39 |
| | | 2007 | $31 | $65 | $32 | NA | NA | NA | NA | $40 |
| | | 2008 | $27 | $56 | $37 | $54 | $42 | $40 | $56 | $36 |
| | | 2009 | $30 | $55 | $33 | $53 | $49 | $50 | $56 | $36 |
| | | 2010 | $30 | $50 | $35 | $55 | $49 | $45 | $61 | $37 |

Source: SOA GRET tables.

61. In addition, in January 2018, Transamerica announced that it entered into an agreement with Tata Consultancy Services ("TCS"). According to the press release issued by Transamerica, "TCS will administer Transamerica's life insurance [business] . . . and take on administration of over 10 million policies." The TCS agreement is expected to result in annual administrative expense savings to Transamerica of approximately $70 million initially, growing to annual savings of $100 million over time. If anything, Transamerica's projected future expenses associated with the Policies is more, not less favorable, than in the past.

62. ***Second***, Transamerica's expectations as to "interest" could not have changed materially for the worse in recent years to warrant an increase in MDRs, much less a massive one. Interest affects an insurance company's ability to generate income from investments on earnings from its portfolio of insurance policies. Different insurers earn, and expect to earn, different returns on their investment portfolios.

63. The massive MDR rate increase cannot be explained or justified by the "interest" factor enumerated in the Policies, nor can it be justified by any purported deviation between

projected and actual funding levels. Even if Transamerica's current expectation is that the company will experience spread compression or even negative interest spreads with respect to the Policies, that would not and could not justify a MDR increase of 61% or more. MDRs may only be changed to account for changes in *future* cost factors, not to compensate the company for any interest-related losses in the past. Further, the Policies have a *separate* "guaranteed interest rate," which is adjustable to account for any changes in the interest rate environment, and an MDR increase cannot be done to circumvent the guaranteed minimum.

64. Transamerica is earning a positive interest income on the policies and, as such, its guaranteed interest obligation cannot properly be viewed as a "cost." Rather, to the extent future expected interest spreads may be lower than projected when the Policies were priced and issued, Transamerica is, at most, earning lower interest profits.

65. ***Third***, Transamerica's expectations as to future "persistency" could not have changed for the worse in recent years to warrant an increase in MDRs, much less a massive one. The BOAGF Policy issued in 1997, and on information and belief, all the Class Members' Policies have been in force for more than 6 years. A 2012 SOA industry study – reporting on a survey of the industry – indicates that between 2001 and 2009, the industry lapse rates for universal life policies that have been in force more than 6 years are stable, varying less than approximately 2 percentage points over that span, and that the lapse rates become more stable the longer the policy has been in force. This indicates that any volatility that Transamerica may have seen in these policies would have occurred in the early years, not now. In September 2018, the SOA published an experience study for premium persistency and surrender/lapse experience for flexible premium life insurance updating the figures for lapse rates. The updated figures in this report show minimal change in lapse rates from the 2012 study. And to the extent Transamerica priced the policies using unreasonable lapse-supported assumptions, it may not now pass the projected late duration losses on to persisting policyowners by increasing the MDRs.

66. Moreover, the only "cost" associated with persistency is incurred when Policies are surrendered, requiring Transamerica to pay terminating Policyholders the cash surrender value of

the surrendered Policy. Where persistency is higher than Transamerica assumed at pricing, thereby resulting in fewer surrenders, the costs attributable to cash surrender payments are lower, not higher, than projected when the Policies were priced. Accordingly, to the extent Transamerica expected future persistency to be higher than it assumed when the Policies were designed and issued, that "cost factor" would suggest a lower MDR, and certainly would not support or justify an MDR increase.

67.    *Fourth*, Transamerica's expectations as to future "taxes" could not have changed materially for the worse in recent years to warrant an increase in MDRs, much less a massive one. To the contrary, Transamerica's expectations as to future taxes are now materially better, in light of the Tax Reform Act of 2017, which should have resulted in lower MDRs, not an increase in rates. Aegon N.V., a Netherlands corporation, acquired Transamerica in 1999. According to Aegon N.V.'s reported financial results in the fourth quarter of 2017, its shareholders' equity "increased by EUR 1.0 billion . . . resulting from US tax reform, due to a reduction in net deferred tax liabilities, of which EUR 554 million was recognized in the profit and loss account." Rather than increased expenses, Transamerica will realize lower projected federal taxes as a result of reduced rates and other benefits to insurance companies. Transamerica's form letter announcing the MDR increase makes no mention of the more favorable corporate tax rate, which if anything should have lowered MDRs, not raised them.

68.    The future cost factors enumerated in the Policies or otherwise, separately or in combination, do not explain the recent MDR increases. Nor is there any other cost factor, beyond those enumerated in the Policies, that can plausibly explain or justify an MDR increase of this size. In short, any future underperformance of the Policies is attributable to Transamerica's own conduct, rather than any change in underlying experience relating to the cost factors that would permit an increase under the Policies.

### c. The New, Increased MDR Rates Are Not "Based on" Attained Age, Sex, and Premium Class

69. For similar reasons, Transamerica has breached the requirement that "The Monthly Cost of Insurance Rate is based on the Insured's: Sex, Attained age, and Premium class shown on page 3," and, in the case of one of the PHT II Policies, "The Cost of Insurance Rate is Based on the insured's: Attained age, and Premium class shown on page 3." Transamerica has also breached provisions stating that "The monthly deduction rate for the base policy will depend on: the face amount of the policy; the Insured's sex; the Insured's smoker or nonsmoker status; the Insured's class of risk as of the Policy Date; the number of years that the policy has been in force; and the Insured's issue age."

70. All of these enumerated factors are well known "mortality factors" that insurance companies use to set expectations of future mortality experience (*i.e.*, an insured's probability of passing away in any given year). Transamerica, however, has not based its MDR increase or the post-increase rates on these enumerated factors, and the new rates "depend on" factors mentioned nowhere in the Policy contracts, such as internal plan codes and product names. For example, Transamerica's MDR workpapers indicate that the increase was driven by a desire to increase profitability, target certain products (while exempting from any rate action other products with the same mortality expectations), recoup past losses, and to make up purported shortfalls in investment margins. None of those motives have anything to do with the age, sex, and premium class of insureds. Further, as noted above, the MDR increase was totally inconsistent with changes in mortality that have occurred since the Policies were issued well over a decade ago.

### d. The MDR Rate Hike Recoups Past Losses

71. The Policies prohibit Transamerica from making any change in MDRs to recoup past losses. The Policies forbid MDR increases to make up for past losses, or from implementing an MDR increase that would result in the carrier making more profit on the policies than it previously expected using its prior expectations. Among other things, the prohibition on forcing policyholders to share in past losses prevents the insurer from engaging in a bait-and-switch tactic,

where it projects cheaper MDRs in the future, collects premiums, and then turns around years later and reveals more expensive MDRs due to losses that were recognized long ago or were embedded into the design of the products at the time of the sale.

72.     Because non-guaranteed elements such as the MDR are required to reflect expectations of *future* experience, Transamerica is precluded from re-determining those elements to recoup past losses, including past losses attributable to the Policies. Transamerica increased MDRs on other universal life policies in 2015 and again in 2017, and in doing so, it reset the baseline for any MDR increase analysis going forward for the policies at issue in this case. Transamerica cannot possibly have had a deterioration in mortality expectations or other expectations since 2017 that could justify such a massive increase in MDRs. Similarly, in connection with Transamerica's prior MDR increases, Transamerica claimed they were justified because of worsened mortality expectations for older age mortality that Transamerica adopted in 2014 and reflected those losses on its financial books in 2014. But Transamerica cannot use changed mortality from 2014 to justify an MDR increase in 2022 – that is illegally recouping past losses. And it is implausible that Transamerica had a deterioration in mortality expectations since 2014 that could justify such a massive increase in the MDRs.

73.     On information and belief, the Policies were designed to allow Transamerica to realize high mortality profits in the early years, immediately after the policies were priced and issued. But as the policies progressed to the later durations, Transamerica faced constrained future profits and looming future losses resulting from its policy design choices. When the date arrived to confront its pricing decisions, Transamerica reacted by saddling Policyholders with the massive MDR increases at issue in this litigation to recoup past losses. The MDR hike was imposed to mitigate or avoid those losses, making the Policies more profitable in future years than the profit levels with the original pricing assumptions using Transamerica's own mortality assumptions.

74.     The massive MDR hike can only be explained as an attempt to recoup past losses. Insurance company actuaries are required to closely monitor and report on trends affecting non-guaranteed elements of its insurance policies. Material deviations between current and future

expected profitability do not occur overnight; they are gradual trends for which actuaries can and do make incremental adjustments.

75.     Transamerica's MDR increase recoups past losses in breach of the terms of the Policies and is an increase in rates for reasons that are not based on its expectations as to future cost factors.

### e.     The MDR Hike Was Not Uniform

76.     The Handorf Policy and PHT II Policies prohibit Transamerica from imposing a non-uniform MDR increase on members of the same premium class. The Policies promise that any increase in cost of insurance rates will be applied uniformly to all members of the same premium class. This Policy provision is consistent with the actuarial principles that policyholders need to be treated equitably in any rate action, and that policy performance should be analyzed in large groups to provide stability and credibility to "class" experience and permit the spreading of risk on which the entire business of life insurance is predicated.

77.     Transamerica's MDR hikes were not uniform among Policyholders within the same premium class, as required by the terms of the Handorf Policy and PHT II Policies. The MDR hikes violated this provision because Transamerica applied increases to some Policies and not others assigned to the same premium class, and indeed targeted very small groups of policies (some as small as *10 policies*) with very different rate actions.[3] For example, the Handorf policy was in the Tobacco premium class and subject to a huge MDR increase, but other Tobacco universal life policies administered by Transamerica were not subject to the MDR increase. Similarly, the PHT II Policies were subject to a massive MDR increase, while other Transamerica policies assigned to the exact same premium classes (Non-Tobacco, Non-Smoker, or Standard) were not subject to

---

[3] For example, one group of 11 Policies received an 8% MDR increase; another group of 35 Policies received a 43% MDR increase; another group of 14 Policies received a 16% MDR increase; while another group of 26 Policyholders received a 151% increase. Meanwhile, other Policyholders—with the exact same premium classes—received no increase whatsoever. Even Policies issued on the *exact same policy form*, in addition to having the same premium class, received wildly disparate increases.

an MDR increase. Transamerica's MDR increase was therefore not applied uniformly to members of the same premium class.

### f. The MDR Hike Harms Policyholders

78. Transamerica knows, and fully expects, that many Class Members surrender or lapse their Policies following the MDR increase. To the extent that Policyholders surrender or lapse their Policies following the MDR increase, Transamerica will wipe the unprofitable policies from its books.

79. Transamerica has actively sought to encourage and provoke Plaintiffs and Class Members to terminate their Policies or reduce the face amount of coverage enough to allow Transamerica to collect the increased monthly deduction charges. In its form letter announcing the MDR increase, Transamerica suggested that Policyholders "may choose to surrender your policy for the cash value … You can take this in cash or you may be able to exchange it for another life insurance policy that accumulates cash value." Transamerica also suggested an alternative "Reduced Face Amount Option," which would drastically reduce the insurance coverage while still allowing Transamerica to pocket the increased monthly deduction charges as long as the Policy remained in force.

80. The Class Members hit by Transamerica's MDR increase include elderly Policyholders who have dutifully paid premiums for decades with the expectation that the Policies would provide protection for their families. For many Class Members, they will lose the cash value of their Policy if they cannot pay the increased costs to maintain it. Due to age-related underwriting considerations, alternative life insurance protection for these elderly Policyholders is now either unavailable or prohibitively expensive. These Policyholders, who are effectively uninsurable due to their age, face the prospect of: (1) surrendering their policies and losing their death benefits at an age when purchasing other life insurance coverage is practically impossible; (2) permitting Transamerica to deplete their policy values through its MDR increase until there is nothing left and the policy "shock lapses"; (3) paying vastly increased premiums with no assurance the cost of insurance will not continue to increase; or (4) accepting cuts in death benefits.

81. As a result of Transamerica's actions, many Class Members are faced with the decision of either paying the exorbitant and unjustified MDR increase, or forever forgoing the life insurance benefits for which they have dutifully paid premiums for years.

## CLASS ACTION ALLEGATIONS

82. This action is brought by Plaintiffs individually and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class – referred to as the "MDR Increase Class" – consists of:

> All owners of universal life insurance policies issued, insured or assumed by Transamerica Life Insurance Company, or its predecessors or successors, subjected to the monthly deduction rate and cost of insurance rate increases first announced in or after 2021.

83. Plaintiffs reserve the right to seek certification of subclasses, or alternative classes, by original issuing company, product, state of issue, or policy language.

84. The Class consists of hundreds of Transamerica Policyholders and is thus so numerous that joinder of all members is impracticable. The identities and addresses of the members of the Class can be readily ascertained from business records maintained by Transamerica.

85. The claims asserted by Plaintiffs are typical of the claims of the Class Members.

86. Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Class.

87. The interests of Plaintiffs are co-extensive with and not antagonistic to those of absent Class Members. Plaintiffs will undertake to represent and protect the interests of absent Class Members.

88. Plaintiffs have engaged the services of counsel who are experienced in complex class litigation and life insurance matters, including MDR increase matters, who will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and the putative Class Members.

89.     Plaintiffs request that the Court afford Class Members with notice and the right to opt-out of any class certified in this action. The names and addresses of all Class Members are in Transamerica's business records, and the Class Members are readily and objectively identifiable.

90.     This action is appropriate as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

a. the construction and interpretation of the form insurance policies at issue in this litigation;

b. whether Transamerica's actions to increase the MDRs on certain universal life policies violated the terms of those form policies; and

c. whether Plaintiffs and Class Members are entitled to receive damages as a result of the unlawful conduct by Transamerica alleged herein and the methodology of calculating those damages.

91.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs that Transamerica committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b. when defendant's liability has been adjudicated, claims of all Class Members can be determined by the Court;

c. this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

d. without a class action, many class members would continue to suffer injury, and Transamerica's violations of law will continue without redress while Transamerica continues to reap and retain the substantial proceeds of its wrongful conduct; and

e. this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

## Breach of Contract

## (on behalf of Plaintiffs and the MDR Increase Class)

92. Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein.

93. The Policies are binding and enforceable contracts.

94. At all relevant times, Plaintiffs and other Class Members have paid premiums to Transamerica and have otherwise performed all their obligations under the Policies.

95. The MDR increase and conduct by Transamerica that preceded it have materially breached the Polices in several respects, including but not limited to:

a. not determining Monthly Deduction Rates based on its expectations as to future cost factors as required by the Policies;

b. not determining Monthly Deduction Rates based on the factors enumerated in the contract that Transamerica claimed the increase was based on;

c. imposing a massive increase in Monthly Deduction Rates to recoup past losses; and

d. imposing non-uniform increases in the Monthly Deduction Rates for Policyholders in the same premium class.

96. Plaintiffs have performed all obligations under the Policies, except to the extent their obligations have been excused by Transamerica's conduct as set forth herein.

97. As a direct and proximate cause of Transamerica's material breaches of the Policies, Plaintiffs and Class Members have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the MDR Increase Class, pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiffs and the damages class compensatory damages, restitution, disgorgement, reinstatement of lapsed and/or surrendered policies, and any other relief permitted by law or equity;

3. Awarding Plaintiffs and the damages class pre-judgment and post-judgment interest as well as attorneys' fees and costs, and all other relief set forth above;

4. Awarding Plaintiffs and the classes such other relief as this Court may deem just and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs and the class hereby demand a trial by jury as to all issues so triable.

DATED: December 1, 2023

Respectfully submitted,

By: */s/ Peter Eugene Deegan, Jr.*
Peter Eugene Deegan, Jr.
pdeegan@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601-3713
Telephone: (312) 836-4052

Steven Sklaver (*pro hac vice*)
ssklaver@susmangodfrey.com
Michael Gervais (*pro hac vice*)
mgervais@susmangodfrey.com
Glenn Bridgman (*pro hac vice*)
gbridgman@susmangodfrey.com
Rohit Nath (*pro hac vice*)
rnath@susmangodfrey.com
Jordan Rux (*pro hac vice*)
jrux@susmangodfrey.com

SUSMAN GODFREY LLP
1900 Avenue of the Stars, 14th Floor

Los Angeles, CA 90067
Telephone: (310) 789-3100
Fax: (310) 789-3150

Seth Ard (*pro hac vice*)
sard@susmangodfrey.com
Ryan C. Kirkpatrick (*pro hac vice*)
rkirkpatrick@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Fax: (212) 336-8340

Brandon Bias (*pro hac vice*)
bbias@susmangodfrey.com
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366

*ATTORNEYS FOR PLAINTIFFS*
BOAGF Holdco LP and Lawrence Handorf